## FALLGATTER v. CITIZENS' NAT. BANK OF WORTHINGTON, MINN., et al.

(District Court, D. Minnesota, Second Division. March 12, 1926.)

1. Banks and banking ⊕⟹288—Deposit made by national bank's stockholders, representing stock assessment, held not special deposit, recoverable by stockholder after failure of bank.

Deposit made by national bank's stockholders, representing a 200 per cent. stock assessment, to create account against which worthless paper could be charged, though ledger page contained notation that it was a special assessment account, to be used only when formal notice of impairment had been received from Comptroller of Currency, held not a special account, which, after failure of bank, stockholder could recover, on ground that no formal notice from Comptroller had been received and that account should not have been used.

2. Banks and banking ⊕⟹288—Stockholder of national bank, seeking to recover stock assessment as a "special deposit," has burden of proof.

Stockholder of national bank, seeking to recover amount of stock assessment on ground that it constituted a special deposit, and so remained until failure of bank, has burden of proof; "special deposit" being money given to bank for a special purpose.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Special Deposit.]

3. Banks and banking ⊕⟹246—Stockholders of national bank, voting stock assessment to create special account, may waive conditions respecting use of fund created.

Stockholders of national bank, voting voluntary stock assessment to create account against which to charge worthless paper, may waive conditions noted on ledger sheet concerning use of such account.

At Law. Action by T. A. Fallgatter against the Citizens' National Bank of Worthington, Minn., and Ferdinand Ringoen, as receiver thereof. Judgment for defendants.

A. R. English, of Tracy, Minn., and James H. Hall, of Marshall, Minn., for plaintiff.

E. H. Nicholas, of Jackson, Minn., for defendants.

JOHN B. SANBORN, District Judge. [1] The plaintiff was, from early in the year 1923 until June 14, 1924, a director of the Citizens' National Bank of Worthington, Minn. During that time he was the owner of 50 shares of its capital stock, of the par value of $5,000. The entire capital stock consisted of 250 shares, of the par value of $100 each. Prior to June 14, 1924, the capital of the bank had become impaired, it had violated its charter and the banking laws of the United States, and on that day it was, by order of the Comptroller of the Currency, closed, and thereupon suspended business. On June 19, 1924, Ferdinand Ringoen was appointed receiver for the bank, and is now acting as such in the liquidation of its affairs.

A meeting of the directors and stockholders of the bank had been held on the 31st day of March, 1924. The stockholders had all been advised by the officers of the defendant bank and by representatives of the examiner of national banks that the bank had certain worthless notes and assets in its files; that its capital was impaired thereby; that, in order to continue as a national bank, certain of such assets must be taken out of the bank, and cash or its equivalent be substituted. At the meeting it was agreed by the plaintiff and all other stockholders that each stockholder should pay in, in cash, an amount equal to 100 per cent. of the stock owned by him, and that the fund so created should be used for the purpose of charging off the worthless notes and bills receivable, and in making good the impairment of the capital caused by the refusal of the examiner to continue to include in the assets a considerable amount of its bills receivable. At this meeting it was further agreed that an additional assessment of 100 per cent. of the par value of the capital stock owned by each stockholder should be paid in, and that the fund created should be used for the same purpose. Each of these assessments was made voluntarily, and for the benefit of the bank, and to improve its financial condition. It was understood by the stockholders, among themselves, that each should pay his full assessment, and that it would not be just or fair that certain stockholders should pay their proportion of the total assessment, and others not. It was further agreed that the funds paid in on account of the assessments should be deposited in the bank, and should be shown on the books as a special account, and that the money should be used in making good the impairment found by the Comptroller of the Currency to exist. All of the first assessment of 100 per cent. was paid in by the stockholders, except that the bank did not actually receive $1,000 thereof which was due from W. W. Loveless, a stockholder. Of the additional assessment of 100 per cent., $14,500 was paid in.

The plaintiff, between the 4th day of April, 1924, and the 16th day of May, 1924,

paid to the bank the sum of $10,000 in cash for his assessment of 200 per cent., which was deposited in the bank to the credit of an account designated on the books of said bank "Special Assessment Account," and also deposited the sum of $833.32 to the same account as a part of the assessment on certain shares of stock owned by another stockholder, who was unable to pay. On or about the 1st day of May, 1924, the bank charged off on its books $23,648.83 of worthless notes, and charged to the "Special Assessment Account," above referred to, an equal amount. All of the moneys received from the stockholders of the bank because of the assessments were mingled with the general funds of the bank, and were used by the bank in the same manner and for the same purposes as the funds of other depositors. On the 14th day of June, 1924, at which time the bank closed, there was cash on hand of $2,870.70; the total cash on hand and in other banks amounted to $9,771.52; the bank's overdrafts in other banks amounted to $12,197.54; and the total assets of the bank were in excess of $500,000.

The minutes of the meeting of March 31st, which apparently was the last meeting of the stockholders or directors, recites the following: "Motion was made, seconded, and carried, all stockholders present voting 'aye,' that an assessment be levied against all outstanding or issued stock amounting to 100 per cent. for the purpose of charging off a part of the interest earned but not collected account and to create an account to charge slow paper to. 233 shares of stock was represented out of a total of 250. There was also a personal agreement that an additional assessment of 100 per cent. be made at once for the same purpose as given above."

On the 9th day of February, 1923, the plaintiff and the other directors of the bank advised the Comptroller of the Currency that they were familiar with its unsatisfactory condition. The concluding paragraph of their letter is as follows: "In conclusion, we promise to get to work at once to place this bank in the position it should be, and, if necessary, to take out all such paper as might result in a loss, in order that the bank may be in such condition as will meet with the approval of your department."

On April 7, 1923, the board of directors, including the plaintiff, sent another communication to the Comptroller of the Currency with reference to the bank, the concluding paragraph of which is as follows: "Our borrowed money has been considerably reduc-

ed, and everything in general looks more favorable to us than it did six months ago, and we believe that we can work out all of this bad paper and leave this bank in a splendid condition within a reasonable time, if we are allowed to take our own methods for it."

On September 1, 1923, another letter was written by the same directors, expressing their familiarity with the affairs of the bank, and replying to criticisms which had been made of certain of its assets. On May 22, 1924, in a letter addressed by the Deputy Comptroller to the board of directors, appears the following statement: "It is noted from the report of an examination of your bank completed March 27th that, through the very commendable action on your part and that of another shareholder in voluntarily paying into the bank $50,000 to take care of losses, the solvency of the bank was restored. This office greatly appreciates the assistance given the bank by these shareholders, who by their loyalty and consideration for the depositors and other creditors, not only saved the bank from failure, but saved the community from a financial disaster with its depressing effects."

The following notation or heading was made upon the "Special Assessment Account" upon the ledger sheet of the bank: "This deposit is made in the Citizens' National Bank of Worthington, Minn., with the understanding that it is to be credited to the 'Special Assessment Account,' and that no part hereof can be withdrawn for any other purpose than the payment of an assessment of 100 per cent. if and when a formal notice of impairment has been received from the Comptroller of the Currency."

The evidence shows that this heading was formulated by the president of the bank and the national bank examiner, who was there March 27th to 31st, making his examination. No formal notice of impairment was received from the Comptroller of the Currency. The plaintiff has brought this action upon the claim that the $10,833.32 which he paid in, and which was credited to this special account, was a special deposit, and that he is entitled to recover it from the bank and its receiver upon that theory.

It is evident that, at the time of the meeting of March 31st, the condition of the bank was understood by the plaintiff and the other directors. It was realized that action must be immediately taken to put the bank in a position which would permit its continued operation; that not less than a 200 per cent. assessment must be made to prevent the clos-

ing of the bank. That was the purpose of the assessment. It is obvious that the Comptroller of the Currency gave no formal notice of impairment of capital, for the reason that he had been advised, by the report of examination made at or about the time of the meeting of March 31st, that a voluntary assessment amounting to $50,000 had been made by the stockholders and had been paid in to the bank for the purpose of taking care of losses. That is indicated by his letter of May 22d.

The minutes of the meeting of March 31st state the purposes for which the assessment was made, and would constitute authority to the officer who had charge of the bank to use the fund for those purposes. He was vice president, had attended the meeting, and kept its minutes. The fund was so used. The notes were taken up on May 1, 1924.

A "special deposit" implies the custody of the property without the authority of the custodian to use it, and the right of the owner to receive back the identical thing deposited. Tuckerman v. Mearns, 262 F. 607, 49 App. D. C. 153.

A special deposit is created whenever a particular thing is delivered to a bank to be returned upon demand. In re Mutual Building Soc., Fed. Cas. No. 9,976, 2 Hughes, 374.

Money given to a bank for any special purpose is a special deposit. Massey v. Fisher (C. C.) 62 F. 958.

The term "special deposits" includes money, securities, and other valuables delivered to banks to be specifically kept and delivered. Pattison v. Syracuse Nat. Bank, 80 N. Y. 82, 36 Am. Rep. 582.

A depositor has the right to tender a deposit for a special purpose, and, if a bank receives such a deposit, the officers of the bank have no right to divert the deposit to other purposes. Union Trust & Savings Bank v. Southern Traction Co. (C. C. A.) 283 F. 50.

[2] The burden of proving that the funds resulting from the assessments were a special deposit, and so remained, is upon the plaintiff. The minutes of the meeting do not show that such funds were to be treated as a special deposit by the bank, nor do the acts of the plaintiff or the other officers or directors, who had charge of its affairs, with respect to the funds. In the absence of the notation on the ledger sheet, there would be nothing in writing to indicate any agreement on the part of the bank to treat this fund as a special deposit. When the directors received from the Comptroller of the Currency the letter of

11 F.(2d)—25

May 22d, they knew that he was proceeding upon the assumption that the money had been paid in for the purpose of restoring the solvency of the bank. If the fact was that it had been paid in to the bank, and had remained as a special deposit, and could only be used in case all of the stockholders paid their assessments, or a formal notice was received from the Comptroller, it was then the duty of the plaintiff and the other directors to so state. That would have been the proper and natural thing for them to do. The plaintiff had been a banker, was familiar with the affairs of the bank, and ought to have known of the use being made of the funds raised by the assessment.

The facts and circumstances shown by the evidence are consistent with the theory that there was originally an understanding among the stockholders themselves that each should pay in his proportion of the entire assessment, and that the fund should not be used until all had paid; but they are inconsistent with the theory that there was a continuing agreement between the bank and its stockholders that all money paid in on account of the assessment should be held intact as a special deposit until each stockholder had paid his proportion in full, and that, if that was not done, the funds should be returned to the stockholders who had contributed them. The fact that the minutes recite no such understanding, that the funds were mingled with the other funds of the bank, that a portion of them were used to take up bad paper, that the Comptroller of the Currency understood that the money had been used to pay losses, and had so advised the directors, and that no information to the contrary was given him, all point to the conclusion that the deposit was not a special one, but that it was used by the bank, without objection by the plaintiff or the other directors and stockholders, for the primary purpose for which it was contributed.

[3] Even if the plaintiff and the other directors had the right originally to insist that the funds contributed by them be held intact, and only released upon the conditions outlined in the ledger sheet, it was a right which they could waive. They controlled the bank and had access to it at all times. It was their business to keep in touch with it, knowing of its precarious condition. There would be a strong inference that the officer in charge acted properly and with authority. It does not seem possible that the plaintiff can now claim, under all the circumstances, that his bank, without his knowledge and consent,

misappropriated a special deposit made by him. The purpose of the assessment was so clearly to immediately increase the solvency of the bank, which a special and conditional deposit would not have done, that a court would not be justified in finding to the contrary.